IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 6, 2024

**STATE OF TENNESSEE v. ADRIAN MOORE**

**Appeal from the Criminal Court for Shelby County**
**No. 20-03903          Chris Craft, Judge**

———————————————

**No. W2023-00664-CCA-R3-CD**

———————————————

The Defendant, Adrian Moore, was convicted in the Shelby County Criminal Court of second degree murder, voluntary manslaughter, especially aggravated robbery, and two counts of possession of a firearm by a convicted felon and received an effective sentence of forty-six years in confinement. On appeal, the Defendant claims that the evidence is insufficient to support his convictions of second degree murder and especially aggravated robbery. Based upon our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which J. ROSS DYER and KYLE A. HIXSON, JJ., joined.

Joseph McClusky (on appeal) and Michael Campbell and Eric Mogy (at trial), Memphis, Tennessee, for the appellant, Adrian Moore.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Rinard, Assistant Attorney General; Steve Mulroy, District Attorney General; and Jose Leon, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case relates to the Defendant's shooting the victim, Jeremy Jerdine, on May 21, 2020. The victim died from his injuries four days later. In December 2020, the Shelby County Grand Jury returned a five-count indictment, charging the Defendant with first degree murder committed during the commission of or the attempt to commit robbery in count one; first degree premeditated murder in count two; especially aggravated robbery in count three; and possession of a firearm by a convicted felon in counts four and five.

The Defendant filed a pretrial motion to bifurcate counts four and five from the remaining counts, and the trial court granted the motion. The Defendant went to trial in January 2023.

At trial, Kenya Jerdine testified that the victim was her husband and that they had four children who ranged in age from six to eighteen years old at the time of the shooting. In March 2020, Mrs. Jerdine and the victim managed an automobile dealership, Vehix, on Covington Pike. They bought vehicles for the business at auction or from other local dealers and advertised them on Facebook Marketplace. Interested customers would come to the dealership to inspect and purchase the vehicles.

Mrs. Jerdine testified that on May 12, 2020, the Defendant purchased a 2009 Nissan Altima. The Altima had 200,000 miles on the odometer, and the Defendant paid $2,700 for the car. On May 20, the Defendant returned to the dealership because the car was having mechanical problems. Mrs. Jerdine said she "immediately got scared" when she saw the Defendant arrive because he was wearing a red bandana around his neck and was "very . . . distraught." The victim invited the Defendant into his office, told the Defendant to calm down, and "insinuated" that he was going to return $600 or $700 to the Defendant. The Defendant and the victim shook hands, and the Defendant left. Mrs. Jerdine stated, "In my mind, I just kind of knew it wasn't like the end. It just didn't look like it was a done situation."

Mrs. Jerdine identified a video recorded at the dealership on May 20, 2020. The video showed a silver Lexus pull into the parking lot about 3:00 p.m. A man wearing blue jean shorts, a white tank top, and a red bandana around his neck got out of the front passenger seat of the Lexus and went into the dealership. The man returned to the Lexus about eighteen minutes later, and the Lexus left the dealership.

Mrs. Jerdine testified that the next morning, she and the victim went to a vehicle auction. They returned home after the auction, and the victim went to Vehix. Mrs. Jerdine did not want him to go to the dealership because she thought the Defendant was supposed to return for the $700 that day. When the victim left home, he had his wallet and cash to pay for a vehicle he had won at the auction. He also had a Ruger handgun that he carried for protection. The gun was black and "very small."

Mrs. Jerdine testified that she later received a telephone call from the victim's niece, "Zandra," who worked at Vehix. Zandra was screaming and told Mrs. Jerdine that "this guy came up here and shot Uncle Jeremy." Mrs. Jerdine and her children went to the hospital, and Mrs. Jerdine spoke with a police officer. The victim had lost a lot of blood and was unconscious, and hospital personnel told Mrs. Jerdine "that he might not wake up."

Mrs. Jerdine testified that she last saw the victim alive on the morning of May 25, before his time of death was announced. She later went to the dealership to get his belongings but never found his wallet, cellular telephone, or handgun. On June 9, 2020, Mrs. Jerdine reported the gun stolen.

On cross-examination, Mrs. Jerdine acknowledged that the victim would carry large amounts of cash and his handgun on his person. However, he did not carry his handgun all of the time. On May 20, the Defendant's and the victim's conversation "escalated" because the Defendant was upset about his car, but they did not fight or argue. They came to an agreement, and the Defendant left without incident. The victim was supposed to return some money to the Defendant the next day, and Mrs. Jerdine did not feel the need to contact the police.

On redirect-examination, Mrs. Jerdine acknowledged that she did not know if the victim's handgun was on his person at the time of the shooting. She said that he carried the gun in his pocket sometimes but that he usually kept the gun in a drawer or on his desk.

Lance Freemon testified that he worked at a dealership across the street from Vehix and that he knew the victim. On May 21, 2020, Mr. Freemon was at work when someone ran inside and said there had been a shooting across the street. Mr. Freemon went outside and saw a man running. The man had a brown gun in his right hand and was wearing black and white shorts, blue underwear, and a white tank top. The man jumped over a fence, so Mr. Freemon got into his car and drove in that direction. He saw the man "nonchalantly walking down the street." The man was holding a cellular telephone to his ear, so Mr. Freeman used his own cellular telephone to photograph the man. Mr. Freemon identified the photograph for the jury. The man ran between two houses, and Mr. Freemon showed the police where he last saw the man. On cross-examination, Mr. Freemon testified that he saw the man run out of Vehix.

Wesley Williams testified that on May 20, 2020, he drove the Defendant to Vehix in Mr. Williams's silver Lexus. The next day, the Defendant asked Mr. Williams to drive him to buy a new cellular telephone. Mr. Williams drove the Defendant to In and Out Wireless, a barbershop, and a Kroger grocery store. The Defendant said he needed to return to Vehix, so Mr. Williams drove him to the dealership. The Defendant went inside while Mr. Williams waited briefly in the car. Mr. Williams then went into the dealership. He did not see anyone in the lobby or office area but heard the Defendant and the victim arguing in the garage in the back of the dealership. Mr. Williams did not know the victim.

Mr. Williams testified that he walked into the garage and stood next to the Defendant. He did not see anything in the Defendant's hands, and the victim was not holding a weapon. Mr. Williams did not know what the Defendant and the victim were

arguing about, but the Defendant suddenly shot the victim. Mr. Williams was scared, so he ran to his Lexus and drove away. He said he later returned to the dealership because he did not have anything to do with the shooting.

On cross-examination, Mr. Williams testified that he waited in the Lexus while the Defendant went into Vehix on May 20. When the Defendant returned to the car, Mr. Williams did not suspect anything was wrong. The next day, the Defendant bought groceries at Kroger and did not seem upset or angry. Mr. Williams did not know the Defendant had a gun or that a shooting was going to occur.

Mr. Williams testified that when he entered Vehix on May 21, he heard the victim and the Defendant yelling at each other. The Defendant's car was not at the dealership, so Mr. Williams did not know why the victim and the Defendant were in the garage. Three or four people were in the garage with the Defendant and the victim. The Defendant was not holding a gun, but Mr. Williams saw the Defendant pull a gun out of his shorts and shoot the victim. Mr. Williams said he did not know if the victim had a gun or if the victim threatened the Defendant. On redirect-examination, Mr. Williams testified that he saw the Defendant fire two shots.

Amber Byrd testified that the victim was like a father figure to her and that she knew him through her girlfriend, "Zan." In May 2020, Ms. Byrd worked at Vehix "detailing" cars. She had been working there four or five months and cleaned the cars for resale. On May 20, Ms. Byrd saw the Defendant at the dealership. The next day, Ms. Byrd was detailing a car when she saw two men arrive. She heard the victim say, "[F]irst of all, you're coming in here hostile. And why you got your hands in your pants like you holding something[?]" One of the men responded, "I'm not holding anything. I'm just scratching my balls." The victim stated, "I told you I was going to give you the $700."

Ms. Byrd testified that Zan came and stood beside her. Fifteen seconds later, they heard gunshots and ran. Ms. Byrd heard three shots before she ran and one shot after she ran for a total of four shots. She saw a silver car leave the dealership and saw the Defendant run away, so she and Zan returned to the garage to check on the victim. Ms. Byrd said that prior to the shooting, she saw the victim in his office with "a wad of cash."

The State showed Ms. Byrd a photograph of a man running in the parking lot after the shooting. He was wearing black and white shorts and a white tank top, and he was holding a gun. Ms. Byrd acknowledged that the man was the Defendant.

On cross-examination, Ms. Byrd testified that the shooting occurred about 4:00 p.m. She was outside the garage when she heard the altercation between the victim and the

Defendant. She did not see the victim or the Defendant with a gun, and she did not witness the shooting.

Officer Marcus Tolbert of the Memphis Police Department ("MPD") testified that he responded to the scene and that an African-American man was lying on the garage floor in a pool of blood. Officer Tolbert's partner began rendering aid to the victim while Officer Tolbert spoke with witnesses, including Amber Byrd, Zandra Buckner, and Lance Freemon. The suspected shooter was described as an African-American male with dreadlocks; wearing a red bandana and a white tank top; and running from the scene. A second suspect drove away from the dealership but returned. On cross-examination, Officer Tolbert acknowledged that the witnesses did not inform the police that money had been taken from the victim.

Lieutenant Steven Foglesong of the MPD testified that he arrived at Vehix about one hour after the shooting and that he became the lead investigator for the case. Blood and two or three cartridge cases were on the floor in the garage. Lieutenant Foglesong spent two hours walking the path the Defendant took after the shooting. He was looking for evidence and video cameras that could have recorded information. Another police officer found a cellular telephone on a street near the dealership.

Officer Tristan Brown of the MPD testified that he went to the dealership to photograph the scene and collect evidence. A pool of blood, several spent cartridge cases, and bullet fragments were on the garage floor.

Alexis Williams testified that in July 2020, she lived on Christyshire Drive and that a man mowing her lawn found a gun in her yard. At that time, Ms. Williams was three or four months pregnant with the Defendant's child. Ms. Williams did not know how the gun ended up in her yard and turned it over to the police. She said that she did not know Wesley Williams but that he had been to her home several times.

On cross-examination, Ms. Williams testified that her lawn had not been mowed in more than a month when the gun was found and that the gun was located after the Defendant was arrested for shooting the victim. On redirect-examination, Ms. Williams acknowledged that the Defendant was arrested at her home.

Lieutenant Shayne Tarena of the MPD's Homicide Bureau testified that the police initially investigated the shooting as an aggravated assault with the Defendant and Mr. Williams as suspects. The shooting became a homicide case when the victim died on May 25. A cellular telephone found by a police officer turned out to be the Defendant's telephone, and the serial number on the gun found in Ms. Williams's yard matched the serial number on the victim's gun.

On cross-examination, Lieutenant Tarena testified that the victim's gun was loaded when it was found. Mrs. Jerdine had reported that the victim's gun and wallet were missing, but she did not report that a specific amount of cash was missing.

Dr. Katrina Van Pelt of the Tennessee Regional Forensic Center testified as an expert in forensic pathology that she performed the victim's autopsy. The victim sustained one indeterminant-range penetrating gunshot wound to his right arm. The bullet traveled through his armpit, struck his eighth rib and right lung, and lodged in one of his vertebral bones. The victim was thirty-three years old at the time of his death and was otherwise healthy. Dr. Van Pelt did not see any soot or stippling on his skin, and she did not receive his clothing for analysis. She said the victim died of a gunshot wound to his right arm and chest. According to the victim's autopsy report, his manner of death was homicide.

Special Agent Kasia Lynch of the Tennessee Bureau of Investigation testified as an expert in firearms identification that she received a Ruger .380-caliber pistol and a magazine containing three .380-caliber cartridges; three .40-caliber Smith & Wesson cartridge cases; and bullet fragments for analysis. The Ruger .380-caliber pistol was in normal operating condition. The three .40-caliber cartridge cases all showed the same pattern of microscopic markings, meaning all of them were fired from the same gun. However, they were too large to have been fired from the Ruger pistol. Most of the bullet fragments were too small for Special Agent Lynch to determine their caliber, but one fragment was large enough for her to determine that it was consistent with a .40-caliber bullet. Special Agent Lynch also was able to determine that none of the bullet fragments was fired from the Ruger pistol. On cross-examination, Special Agent Lynch testified that the Ruger appeared to be rusty. At the conclusion of Special Agent Lynch's testimony, the State rested its case.

The Defendant testified that he met the victim via Facebook Marketplace. The Defendant explained that he saw a Nissan Altima on the website, so he telephoned the victim about the car. The Defendant looked at the car in person and bought the car for $2,700. A few days later, the car started "smoking" and having other issues. The Defendant took the car to a mechanic, and the mechanic told him that the radiator needed to be replaced. The Defendant bought a new radiator at AutoZone, and the mechanic installed it. The mechanic then told the Defendant that "the motor had locked up on the car," so the Defendant contacted the victim. The victim told the Defendant to come to the dealership to talk with him about the car.

The Defendant testified that on May 20, 2020, he went to Vehix to speak with the victim. The Defendant had a gun on his person for protection, and he was wearing a red bandana that he used as a mask due to the Covid pandemic. The Defendant and the victim talked in the victim's office, and the victim said that he would pay half the cost of a new

motor, that he had a mechanic to do the work, and that he would loan the Defendant a car while the Altima was being repaired. The Defendant was satisfied with the agreement and left the dealership.

The Defendant testified that the next day, Mr. Williams drove him to Vehix. The Defendant still had a gun on his person for protection and entered the front of the dealership. The victim was talking on the telephone in his office, so the Defendant waited in the lobby. When the victim finished talking on the telephone, he waved the Defendant into his office. The Defendant and the victim began discussing their agreement, and the victim "got frustrated." The victim said that he would pay half the cost of a new motor and loan the Defendant a car but that the Defendant would have to repair the Altima himself. The Defendant accepted the new agreement and asked when the victim could loan him a car. The victim told the Defendant to follow him, so the Defendant followed the victim into the garage.

The Defendant testified that he thought the victim was going to loan him a car and that he jokingly asked, "Mr. Jerdine, the car you're fixing to loan me, [it's] not going to be like the car you sold me[?]" The victim began yelling at the Defendant. The victim's shirt was moving so that the Defendant could see a gun on the victim's hip. The victim reached for the victim's gun, so the Defendant reached for the Defendant's gun. The Defendant fired one shot, which traveled through his shorts and struck the floor. He then fired two more shots. He said that he did not know which shot struck the victim and that the victim fell to the floor. The Defendant saw the victim's gun on the floor, so he picked up the gun and ran. He said he took the victim's gun because it was close to the victim, other people were in the garage, and he did not want anyone to get the gun.

The Defendant testified that he "lost" his gun while he was running because "it came off [his] hip." The Defendant went to Ms. Williams's house and threw the victim's gun out the back door. After the Defendant's arrest, he telephoned his father from jail. The Defendant acknowledged telling his father "that this didn't happen." The Defendant said he lied to his father because "I didn't want him to have that type of impression about me or look at me like that or nothing like that." The Defendant acknowledged shooting the victim but said he did so because the victim was angry, yelling, and reached for the victim's gun. The Defendant said he thought his life was in danger.

On cross-examination, the Defendant testified that he did not recall seeing Mrs. Jerdine at the dealership on May 20, and he denied that the victim offered to pay him $700. The Defendant did not recall seeing Ms. Byrd at the dealership on May 21. A female was present at the time of the shooting; however, she had her back to him, so he could not identify her. The Defendant bought a cellular telephone at In and Out Wireless on May 20, and he had the new telephone with him at the time of the shooting. The Defendant said

that he did not realize Mr. Williams came into the garage prior to the shooting and that Mr. Williams was not standing beside him at the time of the shooting. The Defendant acknowledged that the victim asked why the Defendant's hands were in his pants. The Defendant said he did not remember telling the victim that he was "scratching his balls."

The Defendant testified that he saw the victim reach for the victim's gun, so he shot the victim. The Defendant requested to demonstrate his motions for the jury, and the trial court allowed him to stand and do so. The Defendant said he reached into his pants and fired three shots "all in one motion, like, bam, bam, bam." The first shot went through the Defendant's shorts and struck the floor. The Defendant fired the remaining shots in the "general direction" of the victim. The Defendant's gun was a .40-caliber handgun and was working properly. The Defendant saw the victim on the floor, saw a woman running, and heard the victim's gun fall onto the floor. He picked up the gun because other people were present. He acknowledged that he panicked and that he did not summon help for the victim.

The Defendant testified that he did not go into the victim's pockets after the shooting. At that point, the State showed the Defendant the same photograph the State had shown to Ms. Byrd. The photograph showed the Defendant running from the dealership after the shooting. In the photograph, the Defendant could be seen holding a gun and what appeared to be a green bag. The State asked the Defendant, "What's in that green bag?" The Defendant responded that he did not know and stated that "it don't look like a bag to me." He acknowledged that he was not holding the green item when he entered the dealership. The Defendant also acknowledged having a prior conviction of theft of property valued one thousand dollars or more but less than ten thousand dollars. He denied taking any money from the victim.

Officer Michael Harber of the Shelby County Sheriff's Office testified on rebuttal for the State and identified a recording of the jailhouse telephone call the Defendant made to his father. The State played the recording for the jury. During the call, the Defendant said, "I ain't shot nobody."

During the final jury charge, the trial court instructed the jury on self-defense. The jury rejected that defense and convicted the Defendant of second degree murder, a Class A felony, as a lesser-included offense of first degree felony murder in count one; voluntary manslaughter, a Class C felony, as a lesser-included offense of first degree premeditated murder in count two; and especially aggravated robbery, a Class A felony, as charged in count three of the indictment.

After the verdicts, the Defendant entered open guilty pleas to possession of a firearm by a convicted felon, a Class B felony, in counts four and five. During the factual basis for the pleas, the State advised the trial court that the Defendant was convicted of aggravated

assault on October 31, 2016. The trial court held a sentencing hearing on March 6, 2023, and sentenced the Defendant as a Range III, persistent offender to forty-six years for second degree murder, fifteen years for voluntary manslaughter, and forty-four years for especially aggravated robbery. The trial court sentenced him as a Range III, career offender to thirty years for each conviction of being a felon in possession of a firearm. The trial court ordered that the Defendant serve the sentences concurrently for a total effective sentence of forty-six years in confinement. On appeal, the Defendant contends that the evidence is insufficient to support his convictions of second degree murder and especially aggravated robbery.

## ANALYSIS

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

### I. Second Degree Murder

The Defendant claims that the evidence is insufficient to support his conviction of second degree murder because the proof did not show that he knew his actions would result

in the victim's death. The Defendant asserts that the proof shows only that he "fired wildly in a panic" after his confrontation with the victim, noting that the first gunshot went through his shorts and struck the floor and that the jury also found him guilty of voluntary manslaughter. The Defendant contends that second degree murder and voluntary manslaughter are inconsistent verdicts and that, while such inconsistent verdicts are permissible in Tennessee, "they should at the very least give cause for review." The State argues that the evidence is sufficient to support the conviction and that the Defendant is not entitled to relief based on inconsistent verdicts. We agree with the State.

Second degree murder is the knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1). Our supreme court has determined that second degree murder is a result-of-conduct offense. *See State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). In contrast, voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." *Id*. at § 39-13-211(a). The principal distinction between the two crimes for purposes of this appeal is the existence of adequate provocation.

Taken in the light most favorable to the State, the evidence shows that on May 20, 2020, the Defendant went to the dealership to speak with the victim about mechanical problems the Defendant was having with his newly-purchased Altima. The victim said he would return $700 of the Defendant's money due to the car's mechanical issues. The Defendant and the victim shook hands, and the Defendant left. The next day, the Defendant, who had a .40-caliber pistol in his shorts, returned to the dealership for the money. He and the victim argued in the garage, and the victim noticed that the Defendant had his hands in his shorts. Ms. Byrd testified that she heard the victim say he was going to return $700 to the Defendant while the Defendant testified that the victim reneged on their agreement to have a mechanic repair the Altima. Regardless of the reason for their argument, the Defendant and the victim were yelling at each other when the Defendant suddenly pulled his gun out of his pants and fired shots at the victim, striking the victim's right arm. The victim fell to the floor, and the Defendant took the victim's gun and wallet. From the proof, a reasonable jury could have concluded that the Defendant was angry with the victim about the car, the money, or both and that he knowingly shot the victim.

As for the jury's verdicts of second degree murder and voluntary manslaughter being inconsistent, our supreme court has considered whether inconsistent verdicts entitle a defendant to relief and has concluded that "the overwhelming authority supports the rule that consistency between verdicts on separate counts of an indictment is not necessary." *State v. Davis*, 466 S.W.3d 49, 76 (Tenn. 2015) (quoting *Wiggins v. State*, 498 S.W.2d 92,

93 (Tenn. 1973)). The court reasoned that inconsistent verdicts may be allowed to stand because

> [t]he most that can be said in such cases is that the verdict shows that either in the acquittal or conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.
>
> . . . .
>
> That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters.

*Id*. (quoting *Wiggins*, 498 S.W.2d at 93). Therefore, the court held that "[c]onsistency in verdicts for multiple count indictments is unnecessary. . . . This Court will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned." *Id*. (quoting *Wiggins*, 498 S.W.2d at 93-94).

As discussed above, the evidence is sufficient to support the Defendant's conviction of second degree murder. The Defendant does not contest the sufficiency of the evidence regarding his conviction of voluntary manslaughter. Accordingly, we conclude that he is not entitled to relief on the basis of inconsistent verdicts.

## II. Especially Aggravated Robbery

The Defendant claims that the evidence is insufficient to support his conviction of especially aggravated robbery because the proof did not show that the theft was accomplished by violence or putting the victim in fear. The Defendant acknowledges that violence preceded the theft but contends that the act of violence and the subsequent theft were not causally connected because "[a]ny theft occurred after the homicide was completed." The State argues that the Defendant is "wrong as a factual matter" because the victim lived for several days after the shooting. We conclude that the evidence is sufficient to support the conviction.

Especially aggravated robbery is defined as robbery "[a]ccomplished with a deadly weapon" and "[w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a)(1), (2). Robbery is the "intentional or knowing theft of property of another by violence or putting the person in fear." *Id*. at § 39-13-401(a). A firearm is a deadly weapon, and "[s]erious bodily injury means bodily injury that involves . . . [a] substantial risk of death[.]" *Id*. at § 39-11-106(6)(A), (37)(A).

In support of his argument that the theft was not accomplished by violence or putting the victim in fear, the Defendant cites *State v. Owens*, 20 S.W.3d 634 (Tenn. 2000). In that case, the defendant grabbed an article of clothing from a store and left without paying. *Owens*, 20 S.W.3d at 637. Two store employees chased him for several blocks. *Id*. When one of the employees approached the defendant, the defendant dropped the clothing, "brandished a box cutter," and walked away. *Id*. The defendant was subsequently convicted of robbery. *Id*. However, our supreme court reversed the robbery conviction and imposed a theft conviction. *Id*. at 641. The court held that in order to constitute the offense of robbery under Tennessee Code Annotated section 39-13-401, "the use of violence or fear must precede or be contemporaneous with the taking of property from the person." *Id*.

Again, taken in the light most favorable to the State, the evidence shows that the victim was going to return $700 to the Defendant on May 21. The Defendant, armed with a handgun in his shorts, returned to the dealership to get the money but got into a dispute with the victim. The Defendant had his hand on his gun during the dispute. The Defendant pulled out the gun and shot the victim, took the victim's wallet and Ruger pistol, and fled the scene. The Defendant discarded the victim's pistol in Ms. Williams's yard, but the victim's wallet was never found. Unlike the facts in *Owens*, the violence in this case preceded the taking of the victim's property. Moreover, to the extent the Defendant is arguing that the theft was an afterthought to the shooting, this court has held that "the intent to steal need not exist prior to or concurrently with the shooting in a case in which the defendant is charged with especially aggravated robbery." *State v. Tucker*, No. M2001-02298-CCA-R3-CD, 2002 WL 1574998, at *7 (Tenn. Crim. App. July 17, 2002). In any event, we think a reasonable jury could infer from the proof that the Defendant intended to take the victim's property when he shot the victim. *See id.* (stating that "when the assault precedes the act of theft, a jury may reasonably infer from a defendant's actions immediately after an assault that the defendant intended to commit the theft prior to, or concurrently with, the assault") (citing *State v. Buggs*, 995 S.W.2d 102, 108 (Tenn. 1999)). Thus, we conclude that the evidence is sufficient to support the Defendant's conviction of especially aggravated robbery.

## CONCLUSION

Upon review, we conclude that the evidence is sufficient to support the Defendant's convictions and affirm the judgments of the trial court.

_____
JOHN W. CAMPBELL, SR., JUDGE